At this time we'll hear New York State v. United Parcel. Good morning, Your Honor. May it please the Court, Mark Perry for UPS. UPS's obligations regarding tobacco delivery are governed by contract law, not state or federal criminal statutes. New York agreed to that bargain in 2005 and the Congress approved it in 2010, exempting UPS by name from the federal and state laws under which penalties were imposed in this case. Judge Forrest, Your Honors, ignored the bargain. Wait, wait, wait, wait. You didn't quite state that exemption correctly, right? They didn't just exempt UPS, they exempted UPS under certain conditions and that's really what the issue is in this case, right? Whether that condition was met. As to the first issue, Judge Lynch, the PACT Act exemption applies to any common carrier that is subject to a qualifying settlement agreement. Subject to a settlement agreement. Now we know we're subject to a settlement agreement so the only question is whether it's a qualifying settlement agreement. The by name one, though, says you are exempt based on this very agreement. You're not relying on the separate clause that applies to other people, you're relying on the one that applies to you. Correct. And that one says you are exempt provided that the assurance of discontinuance is honored throughout the United States and the real issue in this case is whether that condition is met and what that condition means. That's the hundred and fifty . . . So that's what we're really talking about. Basic principles of statutory interpretation mean that the honored clause, as the parties have come to call it, means that so long as the AOD has nationwide operation, it is operative nationwide, it is recognized nationwide, then the exemption is available. And Judge Forrest . . . Here's what puzzles me about what honored means. Here we're talking about honored in the specific context of a contract, right? That's what the context is here. It's about honoring a contract. Yes, Your Honor. Now, if I have an exclusive distributorship agreement from you, for example, and I hear rumors that you're negotiating with one of my competitors to let them be a distributor, too, and I call you up and you say, don't worry, we honor our commitments, we honor our contracts, what is that supposed to mean to me? Your Honor, I think in the context of the court's hypothetical, that tends to imply a compliance agreement. And isn't that normally what honoring a contract means? I mean, that's not a weird hypothetical. That's intended to illustrate what most people would mean when they say this contract must be honored. Understood, Your Honor. But the clause in the statute is not written the way that the court's hypothetical is, respectfully. It's not a stand-alone word, honor the contract. It's passive tense, past tense, is honored throughout the United States. And then there's the parallel clause that says operates throughout the United States for other contracts. We have pointed out, and New York doesn't dispute, that those two things are synonyms. In other words, honored and operates. But operates also is somewhat ambiguous, right? You're saying something operates could mean, indeed, that it's effective throughout the United States. And effective, I guess, already I'm introducing another ambiguity, because effective could either mean it applies throughout the United States or that it actually has some effect. Your operates could mean it has some effect, but it actually operates as a practical matter throughout the United States. And the key that runs through all of those interpretations is throughout the United States. Because remember what Congress was looking at. This is the trucking industry, which must be subject to a uniform nationwide set of rules. And it said either we're going to have the PACT Act, which is a nationwide law, which supplants, or we're going to have these contracts, but they're only with one state, New York, and we will let them control so long as they apply them only in New York, we haven't solved the other 49 states. That makes a lot of sense to me, indeed. But then the question becomes, how could it, what does it even mean? You acknowledge this is going to be complied with throughout the United States, but the only person who can enforce it is the Attorney General of New York. That's correct, Your Honor. And that is... How does that make it a nationwide rule or a nationwide applicability? If it's not complied with in Idaho, New York doesn't have any particular stake in making sure that Idaho collects its taxes. The Attorney General of the United States, who would enforce the PACT Act, doesn't necessarily have any interest. How is an agreement a substitute for a law of nationwide application if it can be effectively ignored in most of the United States without any consequence? Two answers, Your Honor. First, today there is no dispute that the PACT Act does not apply to UPS. UPS is governed solely by the contract, and only New York can enforce it. So that argument simply proves too much. But why do you say today? What has changed today? Judge Forrest made a finding that New York didn't appeal, that since 2015, UPS has been in complete compliance with the AOD, and therefore the PACT Act exemption, under her own construction, is available to UPS. Well, that's because you're now complying. Correct, Your Honor. But not the United States. But no other state can enforce it to this day, because Congress made the decision to leave the enforcement power in the Attorney General of New York. Let me ask this hypothetical. I mean, just following up on the questions asked. Let's  say, what remedy exists for damages, for penalties? Or do you just turn around and say, pound of sand? There's nothing you can do. Not at all, Your Honor. The contract is there precisely for that. New York can enforce the contract according to its terms, and UPS— New York can enforce the contract in Idaho? Yes, Your Honor, as to—if on application. Well, what's New York's interest in enforcing the contract in Idaho? New York seems to have a, you know, full plate handling matters in New York. Your Honor, this—the only time it's ever come up is in New York, in this case. This is the only dispute about this. The policy applies nationwide. It is enforceable by New York as a matter of contract. It's not a pound of sand situation, Your Honor. It is a contract compliance situation. And our complaint with this entire litigation is that it should have been governed from start to finish by the ordinary law of contracts under New York law, rather than these overarching penalty provisions that Congress set aside. Whether that was a good or bad idea— Why couldn't—why couldn't Idaho say, um, to UPS, you're going to have to enter into a contract with us just like the one you entered into in New York? Otherwise, you are not honoring your obligations nationwide. You may be honoring them in New York, but you don't seem to be honoring them here, and this is where we care about it. No state has done that, Your Honor. Well, I don't—I'm not asking that. I'm saying why can't they do that? They could. And if— And then you would have to enter into it, wouldn't you? We would—we would enter into those negotiations. I'm reading from the AOD right now, I think, and I'm reading that no penalty shall be imposed if the violation involves the shipment of cigarettes to an individual consumer outside the state of New York. Correct, Your Honor. So how can the state of New York then enforce the AOD with respect to the shipment to Idaho that Judge Jacobs just asked about? It has all of the contract remedies. It has damages. It has an injunction. It has specific performance. It has a declaration. How has New York suffered damage? It may not have, Your Honor, but that's the nature of a contract-based regime. But my goodness, how—so New York brings a lawsuit for breach of contract, and UPS's defense to that is you haven't been damaged by it because it involves Idaho, and they can't impose penalties because expressly under the AOD, you can't impose penalties for a shipment to Idaho. So—so how does it get enforced? I mean, there's a breach of contract action. I understand that. They've got to pay their lawyers. I understand that. But how does it get enforced? Well, they can get specific performance from a federal judge to order us to do it, right? That's one contract remedy. This is a compliance regime, not a punitive regime. And then you don't do sanctions, I guess, huh? And then we'd be subject to sanctions if we didn't do it. Of course. I mean, that's—that's what the law of contracts does, Your Honor, is voluntary. Excuse me, Mr. Perry. I'm sorry. We're not talking about the law of contracts, really. We're talking about what Congress intended by the word honored. That is part of the statute, not part of the contract with New York. And the question, it seems to me, is why on earth would Congress grant an exemption if the word honored is interpreted the way you want it interpreted based on the kinds of questions that we've all been asking? Your Honor, what we know is what Congress did. Senator Cole, the sponsor in the Senate, said that UPS is exempt from the—so long as the AOD, quote-unquote, remains in effect. Representative Weiner from New York, the House sponsor, said UPS will be permitted to follow its status quo operations under the AOD. There is no doubt that Congress intended the AOD to be the sole determinant of UPS's liability for cigarette shipments, whether or not that was a good or bad idea. If it was honored. If the AOD is honored across the country. And Your Honor, paragraphs 15 and 17 specify that it must be applied across the country. The evidence at the trial showed that it is honored across the country, and there is no contrary evidence. What New York brought in this case is a claim involving one one-thousandth of one percent of UPS's shippers and shipments on four Indian reservations in one state, which is a matter of contract dispute, which we can deal with. But it is not a matter of not being complied with, honored, operative, or anything else throughout the United States. There's no evidence regarding any other state in this record. Judge Walton Sure, that's true. First of all, the question of throughout the United States is a very interesting one. I think it's a more interesting question and more difficult question than what honored means. New York seems to suggest at times that if there's a single village where it's not complied with, that it's not being honored throughout the United States. But the district court, it seemed to me, had a much more nuanced view of this. It said it's not being honored throughout the United States if it's not being honored in significant ways. Now, you can carve it up any way you like, but the fact is that, first of all, New York is the key to this, since they're where it started. It is one of the three, four, five biggest states in the country, and therefore that's a pretty significant matter. There is plenty of evidence in the case that the real source of the problem in New York is that tier of places where this issue has arisen in this case. So this is not just a matter of one tiny place where it's not being honored, but everywhere else in the United States it is. The court says this is not being honored in a way that is very significant and undermines the effectiveness of the agreement. But even in New York, Your Honor, it's four centers, it's a handful of routes, it's one account executive responsible for virtually all of these accounts, which is an issue that's been dealt with since then. It is not that. And by the way, the district court's approach to this . . . All this has a lot of significance, it seems to me, when we get to the penalty phase and what is an appropriate penalty to be adopted. But it seems to me it's sort of like saying, well, you know, there is a lot of legal business we do, and we only disregard this agreement where there's actually a problem. And that's where we don't do it. This is a very, it seems to me, a very significant matter. Precisely if there isn't much evidence about other violations, at least within New York, it's these shippers on the Indian reservations that are the whole reason that this AOD exists. And, Your Honor, if Congress had actually meant what New York says, that there would be a compliance inquiry and that if noncompliance with the agreement would then kick in federal law and kick in state law, it would have written that clause very differently. Because what then is UPS's protection? We have an agreement, but as soon as we don't follow it, we're subject to treble liability under three different regimes. You can't be subject to treble liability because that seems prima facie unreasonable. If you're looking at what penalties are, and you're seeing that very roughly, I mean, and without making any assumption that the district court even got this right, but that roughly there's sort of an $80 million penalty, and then suddenly there are three $80 million penalties. There are lots of arguments that you have, and you've made those arguments about whether that is a sensible penalty to impose. Yes, Your Honor. But it doesn't seem to me that it's at all peculiar for Congress to say, if you've got a nationwide agreement that's going to substitute for a nationwide law and be effective the way a nationwide law would be, then you're exempt from the nationwide laws. But if you have something that is filled with holes and isn't honored and is ignored in significant places in the United States, then you lose the exemption. What's the irrational about that? Your Honor, two other clauses of the PACT Act specifically use the word effective and for those exemptions, for parties that don't have agreements. But we've already seen, I mean, it's fine to say you use the same word and all that stuff when we interpret . . . Well, but it's the same . . . But we, in this very clause, Congress uses two different words that you say are actually the same, operates and honored. But neither of which has an effectiveness. As Judge Forrest, whose view is so nuanced, she read this thing three different ways. The first time she read it, she got it correctly. It has nothing to do with a common carrier's compliance with the settlement agreement. That's at S.A. 19. With the Court's indulgence, if I could spend a minute on the penalties . . . Go ahead. Thank you, Your Honor. And by the way, on the CCTA and actual damages, UPS is happy to submit on the briefs, including the city's cross-appeal. We don't . . . Just keep in mind, we do have extensive . . . I understand. Several hundred pages of briefs . . . I understand. Several hundred pages of district court opinion, plus all the other district court opinions. On the penalties, and I will try to make this as simple as I can, because it's not. We're not on a clean slate this morning. Your Honor, the failure of the adversarial process and the violation of UPS's due process rights with regard to these penalties . . . I just want to point the Court to one thing. The Court does have a lot of briefs. I'd like to just try to fix this, if I could. Everything, $237 million, rests on one document in the record. It's the city and state's April 7th submission. It's JA 507 to 518. That is the only document . . . That's the Arrowhawk letter? No, that's the post-trial expansion of the Arrowhawk letter, if you will. We submit, Your Honor . . . we know the Court will look at this paper. If this had been submitted before trial, as either an expert report or a Rule 26a disclosure, it would have been deficient as a matter of law. If this had been submitted at trial, as evidence with a witness who could be cross-examined, it would be legally insufficient to support the judgment. It was neither of those things. It was submitted after trial, with no cross-examination, no right of response, no inquiry, and that is the only thing that a $237 million judgment now rests on. This is a matter of significant import. If I could just point out one example. The city says these databases are UPS's. We could have looked in them, right? Setting aside the point that we don't have to bring a noose to our own hanging, we did look at the evidence, and we came up with very, very different things. For just one of these shippers, Smokes and Spirits, New York says, at page JA 511 in the post-trial submission, that there are 9,820 packages. For the same shipper, UPS says, and this is at page JA 521, that there are 3,437 packages. It's roughly a three-to-one difference. If you extrapolate that to the case, that's a $150 million difference, or a $140 million difference, right, based on we think there are far fewer packages than they do. Just if we look at that, so putting aside the fact that there may not be that kind of information about everybody else, on this Smokes and Spirits example, we've got two different interpretations of what the spreadsheets mean. Is that right? The spreadsheets and other evidence. There are shipping invoices and multiple spreadsheets, which don't all say the same thing, by the way. Are we to conclude that the district court clearly erred in selecting one of those interpretations? Again, putting aside what impact any of this has on all the other shippers, but this one that we're focused on, is that the argument here, that the district court's conclusion was clearly erroneous in adopting its interpretation of these documents and, I guess, adopting New York's rather than adopting yours? Correct, Your Honor. I mean, our view is that there was legally insufficient evidence at the trial stage. This post-trial information is not evidence at all. Well, this is pointing, this is argument. It's pointing the district court to some documents that are in evidence and saying, like an assumption, it's a lawyer's pitch, which may or may not be persuasive. It's not, Judge Lynch. And New York admits this at page 119 of the red brief. They say this is a large-scale addition and division exercise. And they say at the same page, the required computations are time-consuming. And they say at page 116, you had to sort, remove duplicates, do addition, and calculate. None of those — When addition is calculating, why isn't this simply adding up numbers and knowing what is one expert going to do that another expert doesn't? Well, one answer, Judge Jacobs, is the one I just gave, which is we come up with a three to one different count for the same shippers, right? And the other answer, and this is the much more pragmatic one, look at the shipper called Shipping Services, for example. New York says that they ship 22,523 packages. And for that, they cite PX433. Okay? PX433 is a database. It contains 36.4 million cells. If you printed it out, it would be a stack of paper 30 feet high. If you laid them end-to-end — But you don't need to print it out. And if you touch certain buttons, then these people who know how to do these things can add up boxes in certain fields. Your Honor, but we don't know who those people who did those things were, what buttons they pushed. We never got to cross-examine them. Nobody has ever — there's no evidence in the record. We don't know — of course there's 22,523 boxes listed in that spreadsheet, but we don't know which ones they have identified. They just have numbers untethered by any computation, calculation, methodology, addition, subtraction, division, multiplication, or anything else. Now, but what this says — I mean, they say there are 200 and something thousand boxes or whatever number they give. Yes, Your Honor. And then you segue into, we don't know what was in them. Now, that's a matter that the district court has explained very carefully what it's extrapolating from the evidence as to how it draws conclusions about what percentage of the boxes of the shipments contained cigarettes. That seems to me a rather different question. Totally different. And the question of, is this the right number of packages or not, which seems a much simpler question. Totally different question. When I meant, we don't know what's in there, it's like, we don't know what's in the database. We don't know which of the packages they're identifying from within the database. But I thought the district court's conclusion was the database reflects for each shipper how much business UPS did with them. It doesn't? No, Your Honor. The database reflects, depending on which database you look at — some of them are billing databases, some of them are shipping databases — reflects various information about packages, often but not always clearly tied to account numbers. And many assumptions are required, many calculations are required to get from the database. And again, all the databases total in issue have 83.5 million cells. It's a huge data set. To get from there to a specific package count requires methodology, assumptions, calculations, none of which have ever been disclosed. We have never, UPS and our experts, you know, back in the back room, have never been able to replicate any of New York's numbers. And they've never disputed that. And they've never told us how they got to those numbers. And we keep saying, we can't replicate these numbers. And the hallmark of scientific evidence — and this is, you know, scientific evidence. Bringing numbers out of a huge data set requires something. We don't know where these numbers come from. And there was never a witness on it. There was never a disclosure on it. There was never cross-examination on it. There's no evidence on it. It's simply this six-page document, which I know the Court will look at, JA 507 to 518, which is legally insufficient, even if it were evidence at all, which it's not, to support a quarter-billion-dollar judgment. You know, this is not the way trials are conducted in the United States of America. We never had the opportunity to go through and figure this out. And we think the numbers are very, very different. We'll hear you on rebuttal. Thank you, Your Honor. Now with you, the State. May it please the Court, Steven Wu for the State of New York. I'll be dividing my argument with my friend from New York City. I'll cover the liability issues in point one of our response brief. And the City will address damages and penalties, including our cross-appeal, from point two. And we'll reserve one minute of his time for rebuttal of that argument. I'd like to make a couple of arguments on liability, and to begin with the PACT Act. The overriding purpose of the PACT Act, as its name suggests, was to actually prevent all cigarette trafficking nationwide. We don't usually interpret statutes according to what acronym we come up with. Sure, but the exemptions here have to be understood against that purpose, because the exemptions here were not an excuse from the objectives that Congress wanted to accomplish. They were instead meant to identify, from Congress's perspectives, alternative ways of achieving the same goal, which is to block cigarette trafficking. And so what's relevant for Congress was not the mere existence of a legal mechanism to enforce compliance, but instead some demonstration that there was an existing mechanism that actually solved the problem, and therefore made the federal regime unnecessary as a practical matter. There was no need to adopt these additional obligations. So the question becomes, what is the validity of the district judge's distinction between breaching a little bit and breaching a lot? And where do we get breaching a lot in this case where we've got millions of packages flying over the United States? I don't understand that, because it looks as though, under your analysis, you'd have to have a trial under the AOD in order to find out whether the PACT Act even applies. And it seems to me very irregular as a way of proceeding and very improbable. Well, if I could start at the beginning of that process, because here the district court's findings were that UPS's violations of the AOD were egregious. And what I mean by the beginning is what the AOD spelled out in considerable detail were a series of corporate policies and practices that UPS was supposed to institute when the agreement was entered into in 2005. Training, auditing, and so on. And the evidence at trial, undisputed by UPS on the appeal, was that the company did none of this. Absolutely none of this. These are nationwide obligations that are imposed at the nationwide level. That's correct. At the centralized sort of corporate level by UPS that they agreed to commit to to accomplish the absolute objective spelled out in the AOD to stop delivering cigarette shipments to individual consumers. That is a commitment that they made in this AOD to avoid significant statutory penalties and obligations. And again, what the district court found was that they did none of these things. They did not have any compliance training for the ostensible executive in charge of monitoring compliance, Brad Cook, who was the director of Dangerous Goods. They did basically no training for any employees. There was extensive testimony that employees really at all levels either was not aware of the AOD or didn't sort of like get regular training about what compliance meant. They didn't respond when there were findings, when there was actual evidence that these shippers were engaged in cigarette shipments. They didn't respond. They didn't terminate them. People complained that I didn't get my cigarettes and complained to UPS what happened to the shipment of my cigarettes. There was not a response typically by UPS at all. That's correct. The AOD required a centralized database to collect that information and to ensure compliance and UPS did none of that. I mean, there were The PACT Act has a database, the noncompliant list that was compiled by the federal government and sent to UPS and there's evidence that they ignored that and did not cut off shippers who were on that list. That's correct. Now, I know UPS will argue that it weren't required to comply with the separate point on the NCL list was that this was a list that the federal government had used to identify known cigarette shippers who were in violation of their federal obligation. And if you were trying to comply with the AOD, it would be a logical thing to say, gee, I wonder if we should look at these people that the Attorney General thinks are shipping cigarettes. That's correct. And I think what this all goes to show is I think quite separate from how many cigarette shipments actually took place at the end of the day that we were able to prove at trial. Quite separate from that, the evidence of noncompliance from the UPS was centralized, was vast, you know, and extended to all levels until recently UPS actually began complying. And I think that's the other important point here. UPS knew what it meant to comply. By the time that this case was really initiated, as the district court found, they started sort of beginning these steps required by the AOD to hire more personnel, send them out to these shippers, to conduct their own audits. And at that point was what the district court found to be the first meaningful steps to adhere to the AOD altogether. Well, I don't know. Maybe this is something you will say, Mr. Deering, will deal with. But you started this by saying that Congress intended the AOD and the PACT Act to be alternatives in pursuit of, and I don't want to really tax you too much with the words, in order to have this effect that Congress was seeking. But you did use the word alternatives. What happens here in your interpretation of the statute is that rather than being alternatives, they become cumulative penalty regimes where essentially the same shipments of cigarettes become violations of not just the PACT Act, not just the AOD, not just both of them, but also of the New York Public Health Law, also of the CCTA, a separate federal statute. That doesn't sound like alternatives. That seems like piling on. Where do we find that intent? Well, in a couple of places. I want to begin with the point, though, that what the mechanisms here give a shipper, like a common carrier like UPS, is they can pick strict compliance with the AOD and not have to comply with the PACT Act. And that is a fair choice. That's a choice that they entered into. But the reason why it's fair to impose this escalating series of penalties and other sanctions is because that's the problem that Congress and the states were trying to address. I mean, these statutes were not enacted at the same time. They were enacted over time. The agreement was entered over time precisely because at every step of the way, preexisting penalties, sanctions, compliance regimes were found to be inadequate. And they're not precisely parallel. I mean, the PACT Act has a very robust compliance mechanism. It absolutely prohibits deliveries from shippers on the NCL list. And it does so regardless of what they're shipping. And it does so precisely because the obligation that you not ship cigarettes specifically turned out to be difficult to enforce and broadly not adhered to. So each of these escalating steps was a separate and heightened means for Congress and the states to ensure their objectives. So I take it the short answer to Judge Lynch's question is this is a quadruple damages case. Right. It's not exactly a quadruple damages case. It's not exactly quadruple. It's exactly treble damages plus a little more. Well, it's not exactly the same. My friend from the city will deal with this. But the bases for the liability are somewhat different from each of these, reflecting the different statutory purposes and the contractual purposes of these agreements. And just to highlight one point that I do want to emphasize before I sit down is the AOD penalties here were imposed for a distinct obligation under the AOD alone, which is the auditing obligation that UPS was required to undertake. Yes, they did. What's the penalty for violating the auditing provisions of that contract? Right. I think the answer to that comes from understanding that the auditing obligation was really the beginning of a tier disciplinary process. But we're interpreting a contract, right? And the contract says here are going to be the damages that you're going to be here, the penalties you're going to pay if you violate the contract. Where does it say if you fail to audit, you're going to be penalized $1,000 for every single package you ship? Well, so the penalty provision itself says that the penalty applies for each and every violation of the AOD without limitation. I got you. And the auditing requirement, again, does not stand alone. The auditing requirement was meant to identify improper cigarette shipments. And the response to an audit was to either or shipping cigarettes. Yes, but Mr. Wu, you see the problem here is that lets you have it both ways. You want to say the audit obligation is a separate and distinct obligation that is different than the obligations under the PACT Act or the obligations under the AOD to not ship cigarettes. But then you want to turn around and say that because the audit obligation is intended ultimately to be a preventative to those other violations, then if they violate the audit obligation, they don't just get a penalty you didn't audit. They get a penalty that is for each and every shipment of cigarettes at least and maybe of everything else that they ship, just like under the PACT Act. So it stops being a separate obligation. It starts to be a duplicative measure of damages. The reason it's a separate obligation that it's proportional to the wrong that was committed here is because the audit obligation was really central to the enforcement of the AOD. I understand that it's central, but it is a violation. I mean, they argue it isn't violation. It's not covered by the penalty board. Put that aside. Your argument is it applies to every violation. And I think you have to take the good with the bad. The good and the thing they want to say makes this whole thing ridiculous is every paperwork violation takes a $1,000 fine. But you are, so okay, every violation, every audit violation already gets a penalty. But then you want to transmogrify that into not just, you know, what's the unit of the offense, so to speak, that entails a violation is perhaps just we didn't do an audit. Now they may have other violations of the AOD. You may have proved other violations of the violation. I'm not sure why it's central or not. Violating it gets you much more than a $1,000 penalty. Well, because the violation here isn't just sort of a one-time per shipper occurrence of the failure to audit, but it is UPS's continuing delivery of shipments from a shipper that they had a reasonable basis to believe was shipping cigarettes. Except that the AOD doesn't say, it doesn't say that a $1,000 penalty applies to every shipping a package after a violation of the audit duty is a violation of the agreement or that shipping without an audit is knowingly shipping tobacco products. It doesn't say any of those things. It simply says there's an audit requirement and it makes it even more problematic given that UPS is only to be penalized $1,000 if they knowingly ship a package with tobacco products, right? There's a knowingly requirement in there. So when you say failure to audit, every package gets shipped, you're taking that knowingly right out of the agreement. Well, I think the answer to that comes from the obligations under the audit provisions, right? Which is, again, is not just about opening every single package, which is what an audit consists of, but instead is when cigarettes are discovered to then halt deliveries from that shipper. I mean, again, UPS committed to this robust enforcement mechanism. This was not required under the PHL to say that when you found cigarettes, you altogether halt them. But they agreed to that mechanism precisely because the existing statutory mechanisms were not enough. And that's the reason that the unit of the penalties under the AOD for the failure of the audit obligation has to extend to the deliveries that are made from unaudited packages from shippers they had a reasonable basis to believe were shipping cigarettes improperly. And if I could make this one final point, I mean, the absurd consequence of UPS's argument is that they could fail to comply with the audit requirement, get what they said is a $20,000 penalty, one for each shipper, for violating one of the central obligations that is key to the enforcement of the AOD, and do so in a way that not only prevents the immediate compliance with the AOD, but also hampers law enforcement efforts after the fact. One of the problems with this case is we're being offered a choice of absurdities. So, thank you. We'll hear you. I would disagree with that. I appreciate that. Thank you. May it please the Court, Richard Deering. If I could start just briefly on this issue of the spreadsheets, and then I'll turn to what are clearly questions about the penalty regimes here. The spreadsheets, I think, are emblematic of approach by UPS to the procedural side of this case, which is to make things that are pretty simple seem really complicated, to ignore the fact that they were able to mount defenses, and successfully did in many instances, and to also ignore that they chose to forego other opportunities to make defenses about these spreadsheets. So, let's just talk about, these are UPS's spreadsheets. Any row of the spreadsheet that we're talking about here, we're talking about a tracking number, which we know is a package, a shipper number, a date, pickup date, recipient name and address. Those are the key fields. The spreadsheets are enormous, but that's all you need. That is prima facie proof of a package, pretty simple. Now, let's talk about the letter, the April 7th letter. That letter came after the district judge had made specific findings. It was a mechanical . . . after she's made all these specific findings on liability, including dates, how are you going to look at the spreadsheets, she credited many arguments of UPS to exclude certain kinds of shipments from the spreadsheets. And as to each shipper, 50% of it is cigarettes, 95% is cigarettes, and so on. She makes findings about . . . What was the basis for those findings? Primarily the basis was evidence from UPS. It was primarily, I would say a combination of two things. I shouldn't say primarily. Two major categories. Some of it was shipper evidence in limited cases where shippers had been criminally convicted. We had invoices, testimony from shippers in those kinds of cases. That's probably about 40% total of your package counts and carton counts came from that kind of case. When you didn't have shipper-specific evidence, most of the time it was evidence derived from UPS audits. And I'll give you two examples just to illustrate this. eXpress, which is a shipper, she puts it as a 100% shipper. It's a shipper that was opened up . . . account opened up by the same principal two days after his retail smoke shop account had been shut down. He opens two days later a new account, calls it eXpress. There's indications of cigarette shipments all along. Eventually we get to a point where three packages break open. All three of those packages have cigarettes. Two days later, an audit is ordered. Ninety-nine packages are opened. Ninety-nine packages have cigarettes. Judge Forrest says that's going to be a 100% shipper. I'll give you another example. Action Race Parts. Action Race Parts is a shipper that shipped almost exclusively to smoke shops, other smoke shops on Indian Reservation. It was a cigarette manufacturer. At some point, State Department of Tax and Finance conducts a seizure. They seize 40 boxes of packages from Action Race Parts. They open them up. All 40 boxes have not just cigarettes, but there are 40 cases of cigarettes, meaning 400,000 cigarettes in that seizure. She puts that as a 100% shipper. In other cases, UPS's audit showed lower numbers, and she credited that in UPS's favor by reducing the percentage. Let's turn to, if we can, to another subject, which is the 50% diversion factor. The judge found as fact that if a person who gets untaxed cigarettes through the mail couldn't get them through UPS, that 50% of them would buy taxed cigarettes. That's about, if you smoke a carton a week, that's like $3,000 in New York City. This is a very regressive tax. You're not talking about wealthy people. How could anybody assume that 50% of the people who buy untaxed cigarettes are just going to turn and pay $3,000 out of their pockets in taxes? They should. They should. Where did the 50% come from? She created that in a whole clot, didn't she? I think she created it by not crediting many of the assumptions that underlay the expert's lower number. That means it's not the lower number. Where does 50% come from? This is how I look at that. I think the best and cleanest answer is a legal one, but I'll try to stay on your question for a moment. I think the cleanest answer on the fact side comes from cases like Bigelow and Contemporary Mission that say, look, if you have damages that fall some uncertain place below an upper limit and the wrongdoer is responsible for that uncertainty, it's on the wrongdoer at a minimum, even if the court is going to entertain this kind of argument, it's on the wrongdoer at a minimum to segregate the part of damages that's not appropriate. It's not on us to do that. If their expert opinion is not credited, once she determines that certain assumptions underlying that are not worthy of being credited, it's within the judge's ... I distracted you from answering Judge Jacob's question. Yeah. I think, honestly ... After discrediting it, there's basically no reliable and integrated expert testimony, so your real position should be 100%. That indeed is our position for that reason and a second one, which I think ... Of course, that's absurd, right? Because the idea that 100% of people, mainly addicts, people of limited income are going to go and pay $3,000 a year in taxes voluntarily, because that's how it sort of works out, if illegally, it really doesn't make any sense. Well, I do think there's a dependency issue that's important there, but I also would say two things about that, Judge. I'm trying to decide which order to go in, but the first one is that the ... I'll say the first one is that our law, one's a sort of general point and then a more specific one. Our law doesn't generally allow a damages remedy or other remedy to be reduced based on the assumption of extrinsic other illegality would have filled that void. That's what the court did. Well, and I think that is our cross appeal and that was an error. Honestly, that is the simplest answer, is that this whole question was misbegotten. It's not your cross appeal, but then you end up with something that is obviously contrary to fact and reason. I don't think it is, because it is the proper, even if we put aside this topsy-turvy quality of pointing to other illegality as the source of a diminished damages remedy, basic causation principles would say that the taxes owed on the ... We don't need to construct a complicated model of a hypothetical world. We know these transactions actually happen, and the simplest way to write that wrong in the but-for world is taxes were paid on those transactions and the wrongdoers who are legally responsible for that ... It's rather like we had this scandal some years ago in big jewelry stores in New York City that you probably are old enough to remember, where some place ... I don't want to ... I won't say thank you, but ... Some big jewelry store would do this. A person walks in, buys a $20,000 diamond ring. The $20,000 diamond ring is handed over the counter. Sales tax is due, but the jewelry store sends an empty package to New Jersey and claims that it contained the diamond ring, and therefore no taxes are due. It seems to me the jewelry store is responsible for the tax, and we don't inquire, we don't ask the question, if they had said, we're going to charge you sales tax, would the person have said, well then I don't want the diamond ring, I'll go and buy it in a mall in Paramus instead? Or would the person have found some other store in New York City that was willing to break the law and buy it there? Or say, I'm not interested in diamonds anymore, I have to pay taxes on it because I object to paying sales tax. The damage is done, the transaction was completed without the tax being collected, and the tax is due and owing. So it would seem to me that would certainly apply to the shippers. And then the question is, if you have a joint tort feeser who aids and abets the transaction, are they responsible? And most of the time with aiding and abetting type things, we don't require causation. We don't say, oh, you gave the bank robber his gun? Well, he probably would have got it elsewhere if you didn't give it to him. You aided and abetted the transaction. Is that kind of what you're... I think that is the simplest way to break it down. In fact, UPS admits, they say obviously the shipper would be liable under the CTTA to pay the tax on the actual transactions. And the restatement rule is very simple on joint, it's called in the restatement contributing to our feesers. If someone who substantially assists the causation of the injury and in doing so violates a separate duty to the plaintiff, which is true here under the CCTA, is responsible for the entirety of the injury. And I also have a separate question that goes to, so suppose we don't buy that argument and suppose we are looking to establish causation. What does an expert look to? It seems to me that it's not just that their expert could be discredited in particular ways. I have trouble understanding what methodology there would be. Do you ask questions like, well, if you live on the Upper West Side, it's not that hard to get to New Jersey where the tax is lower and so you can buy cigarettes at a lower tax rate and you'd never pay the New Jersey tax. I'm not sure that's true if you live in Syracuse or Rochester as to where you go and how far you have to go to get cigarettes at a lower tax rate. I'm not sure how you calculate how many people quit. Of course, you want them to quit, that's why the tax is so high, so I take it the whole premise of your argument about public health consequences is that this is helping, their behavior is helping people not break their addiction. So somebody's going to quit, but how many are going to quit? Well, people are willing to buy cocaine even though it's going to potentially send them to prison. People are willing to smoke cigarettes even though it may cause them to die a painful death of cancer as somebody seems to think I need to be reminded with disgusting television ads all the time. People still do these things, so it seems to me quite obvious that the 5.4% number is ridiculous. It implies that 96% of people will find ways around the law or will stop smoking, but somebody will. So I'm just having trouble understanding how it is practicable to have this kind of look-like to make a real finding about this. I think that's an excellent point, and it's sort of the third layer of reasons why this diversion approach to causation was misbegotten from the outset, is that there's a simple measure available that is legally appropriate, and this is an incredibly complex sort of modeling of counterfactual worlds. We know transactions actually happen. Taxes were owed. That's simple. The law usually favors the simple causation versus the inordinately complex one, and on just sort of a codicil of that point, on your point about people quitting, I think the irony of that, of the UPS approach, is that those people didn't quit. As you said, we want them to quit, but they smoked those cigarettes, and what they want to do is knock down the damages on the theory that in a counterfactual world they might not have smoked them at all, but they did, and the public health harms that result from that happened. The Supreme Court in Hemi, in a similar context, but in Rico, just asked us to get in touch with reality, that what are we talking about here? These are not cigarette manufacturers. These are not shippers of cigarettes. You're seeking a court of a billion dollars. Essentially, the judge seemed to think, in part on the basis that it costs $10 billion a year in illnesses associated with cigarettes. A lot of these figures seem to be assuming that the United Parcel Service is manufacturing and marketing cigarettes, and indeed, the penalties and the damages would be no different if they were. That's actually not true. The PACT Act has a different penalty scheme, a higher penalty scheme for shippers. That illustrates and points to what I think is key. Mr. Wu covered it, which is the AOD and these statutes were targeted at exactly the conduct UPS engaged in. This is not marginal or peripheral to the point of those statutes. I'll explain this this way. The strategy of those statutes was to say, we've had tax evasion of cigarette taxes, which is not just a revenue matter, but a public health matter, for decades. There have been repeated attempts legislatively and through enforcement to shut it down. I think it's fair to say with very mixed success. We get to a point where we have a mail order cigarette problem. You have a few options. One is you can focus your regulatory energies entirely on the whack-a-mole game of tracking down these individually small shippers who don't have much resources, who are on Indian reservations, or you can do something else. You can decide that you've got a choke point. You have to make mail order work. The choke point is you can collect the taxes from the shipping company. No, the choke point is you need a delivery service to make mail order work. You need a service that will deliver cigarettes to someone's doorstep the way you get a book from Amazon delivered to your doorstep. That's what the AOD focuses on. That's what the PACT Act focuses on. That's what the PHL focuses on. The risk of extending your argument unduly strikes me as part of the problem. I entirely agree with you that it's appropriate to have some kind of penalty regime here. I'm inclined to agree with you, subject to conferring with my colleagues and hearing a rebuttal, that you're right about the 100%. Of course, all the 100% does is it doubles a $9 million damage finding. That's a drop in the bucket compared to the penalty provisions that are being imposed. That's not just the damages. If we double the damages, the penalties are still vastly a multiple of the actual taxes evaded. Now, I understand that there are penalties in each of these regimes. I understand that there is considerable discretion in choosing the statute under the PACT Act because there's a range and the judge has to pick what amount per violation. The $1,000 in the AOD is inflexible, but then we've got the problem Judge Villardo was referring to about what is the penalty for the audit violations on which the state concentrated. When you get right down to it, what you just said is kind of all of these regimes are aimed at the same thing. They're aimed at the same problem. When you have these cascading penalties, I'm not even getting close to constitutional excessive fines or anything like that. I'm trying to understand how it is a rational use of discretion to take the same set of violations, which crediting everything the district court came up with seems to be the high number here is like an $80 million set of penalties. Then you just whack them, whack them, whack them under three different schemes for the same conduct using essentially the same calculations, which are about how many cartons containing cigarettes were shipped with modest variations in them. You wind up with a number that, as Judge Jacobs is suggesting, seems strange. Okay. Well, it won't surprise you to say I don't think it's strange. You don't think it's strange. A few points to try to take them in order. They target the same problem, but they do have different elements. I understand your point goes to discretion, and so I won't stay long on that. I just want to make that clear. It's not like a Blockburger double jeopardy. It's not that kind of . . . It's not close to that. There are different elements, different conduct at issue. Judge Forrest cut the penalties under the statutes in half, so you don't really need three separate regimes to reach this number. She could have reached the same number under two. I think the best way to understand it . . . I think your question goes to the exercise of discretion, and I'd make two points that are important and both come through clearly in the judge's opinion. One, and this Court just made this observation this week in the Roger Rotnam case, that you do need to consider the wherewithal of a defendant in assessing these penalties. This is a Fortune 50 company. This is not Milhelm Matea individuals for whom $7 million for an individual is enormous. This is a Fortune 50 company, and the judge properly, I think, decided when she was setting the amount of the penalty that that really mattered, that it needed to be a significant deterrent. The second thing related to that is you've got a history here. You have a history of a particular defendant before the court who had an AOD, whose . . . the enforcement, the specific enforcement energies of the State of New York had been turned to this defendant. They had an AOD, and as Mr. Wu, I think, well explained, the company blew it off. They had . . . you know, maybe . . . It leads right to the rebuttal, which I'm going to ask about now. So thank you. Okay. Thank you. Did I correctly read that Judge Forrest left the bench? Is that right? That's correct, Your Honor. I think I understand why. I won't comment on that and move straight along. Mr. Wu makes the argument that you can't begin to say that UPS has honored the AOD nationwide because the focus of the illegal commerce is here in New York, and your client did nothing to comply, to educate anybody, or to conduct audits, and simply blew it off. If that is so, wouldn't that be the easiest and simplest way of resolving the otherwise very difficult question of saying whether the AOD needs to be set aside in favor of the PACDAC and the public health law? Two answers, Your Honor. First, Mr. Wu simply misrepresents the record. UPS conducted audits. Twenty-five of the twenty-eight audits introduced at trial found no cigarettes. This is not a period of noncompliance. UPS conducted training. The AOD requires very specific training, annual training using the AOD. UPS did everything required in the AOD. The district court faulted UPS . . . Do you have a finding of that? No. Yes, we have the district court faulting UPS for not doing things that it does now that are not required by the AOD. In other words, their description of noncompliance . . . Can I ask you about any finding as to compliance with what is in the AOD? Yes, Your Honor. We cite in our brief as to the actual findings we think shows compliance. But more importantly, and this is the second answer . . . was not really put in a position to do his job. Did it not find that the training for drivers and staff were inadequate? And on and on. It did, Your Honor. And this goes to my second point. Those are clearly erroneous. We are not challenging them. You are not challenging them. And this goes to the second point, which is the more important one for today. This is a regime of contract-based supervision. That's where I started and where I'd like to finish. The New York bargained into this because its law was preempted. Remember, the Supreme Court agreed with us on that. It couldn't do any of this except voluntarily under a contract. And when you have a contract, it is not going to have perfect compliance. And UPS learned over time. And there are findings on that. And Judge Forrest very specifically found that by the time of trial, UPS is in compliance. Well, that's not exactly surprising. And I'm not sure that's really relevant. It is relevant for this reason, Your Honor. When you have a contract, that is the enforcement regime. New York has the ability to pursue the contract remedies. And to pack that question, which is where you started, Judge Jacobs, on honored, Congress could not have imagined that noncompliance with the contract would kick in all these other things because then what was the purpose of the exemption? Mr. Wu said, if you have perfect compliance, you're exempt. Well, if you have perfect compliance, you don't need an exemption. But Congress does not rely on perfect compliance. Judge Forrest made findings that there was very little compliance. There was inadequate compliance. I forget the exact words she used to set her standard. But the standard was sufficient noncompliance to make this not an effective regime, period. And, Your Honor, without finding . . . And that's again something that you are not saying is clearly erroneous. We are saying, however, that there is not evidence in this record of a single managerial employee ever knowing of cigarette quantities. But if there's not a . . . I mean, under every criminal statute, corporations have been prosecuted criminally for things that are done by lower-level employees. There's respondeat superior. In terms of contract and tort, you have respondeat superior obligations. Again, all of this seems to me to be highly relevant to the question of what is appropriate in terms of the statute. The statute that the regime was complied with in gross and we have only immaterial type violations seems to blink the record here. Your Honor, and again, we submit to the contract and to contract remedies. Our point is that that noncompliance that the Court has observed is not what honor means. And if the Court has any questions about that, by the way, we have two interested parties here. The Justice Department hasn't weighed in here. This is a federal statute. The Court might want to know what the government thinks about this because . . . I don't think it's worthwhile to weigh in. Well, I'm not sure anybody asked him. But there's a point. Two other points, if I may. Thank you, Your Honor. On the penalties, Mr. Deering said this was proportionate to what others get. That's just false. The only one that we know about is Mil Helmetea. We cited in our yellow brief at page 110. They shipped 10 million cartons of cigarettes and New York recommended a $7 million penalty. We shipped 80,000 packages that nobody knows what they contains and they're getting a $240 million penalty. There's some problem there. One can't just make up numbers off the top of the head. Those are real numbers, but the point is there. I understand, but they have to be arrived at by some text. So the correctness of the numbers, where do they come from, these spreadsheets, Your Honor? The District Court . . . Didn't you stipulate the fact that those are the spreadsheets? You produced them, didn't you? We produced them. They are authentic and they are in evidence. That's not the question, but the district judge could not derive from them the figures that are now being imposed as penalties. She had to ask after the close of evidence, what's the number? After asking, by the way, on the first day of trial, what's your number? She asked both parties or all three parties and two of them made a submission and your client didn't? That's not true, Your Honor. We made a lengthy submission in which we objected to the entire process and pointed out . . . I understand you objected to the entire process, but you did not . . . you didn't add up the . . . We did, Your Honor. It's at page JA . . . As to the three? As to the three that complied with the Arrowhawk letter and for which the plaintiffs put in any evidence at trial, we put in the numbers. That's correct. And as to the rest, there are only the databases, these massive sets of information. You know, Mr. Dearing said there's only a few relevant row headings. The row headings alone, if you print them out, run across eighteen pages. I mean, these are enormous, Your Honor, and to suggest that there must be a pony in here somewhere is the rule of law to be applied in this case. It's not acceptable in any case and it's certainly not acceptable when $250 million is on the line. What the court effectively did was bifurcate liability and damages after denying New York's motion to bifurcate liability and damages, but then we never got the damages trial. We got the liability opinion and then we never had an evidentiary hearing on . . . You'd like a remand for a damages trial? Well, we think they lose because there's not sufficient evidence in the actual trial record and they closed the record. But at minimum, we would need a remand to discern the amount of penalties due under whatever liability regime this Court may find. You know, I don't think it can be a trebled regime. The AOD honored thing, there must be an on-off switch in there somewhere. Congress, there's no way to read that provision to say Congress meant over and over and over again. Thank you. Thank you, Your Honor. It would be impossible to reach all of the issues here. There are wheels within wheels, but it was expertly argued and we will reserve decision.